Clarence J. KING; Martha A. King; and Michelle E. King, Plaintiffs,

v.

CITY OF FORT WAYNE, INDIANA; Robert J. Lalone; Thomas Turflinger; Kenneth Gigli; Gregory Lewis; and Douglas Haskell, Defendants.

Civ. A. No. F 83–59.

United States District Court, N.D. Indiana, Fort Wayne Division.

March 29, 1984.

Larry J. Burke, Larry J. Burke P.C., Fort Wayne, Ind., for plaintiffs.

John D. Walda, Barrett, Barrett & McNagny, Fort Wayne, Ind., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial, held January 24, 1984. Final arguments were held February 1, 1984. The case deals with alleged violations of the fourth and fourteenth amendments to the United States Constitution, and 42 U.S.C. § 1983. This court, having considered the entire record and being duly advised, hereby enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

The plaintiffs in this cause are Clarence J. King, Martha A. King, and Michelle E. King. On October 18, 1981, plaintiffs resided at 925 East Hawthorne Street, Fort Wayne, Indiana. Plaintiffs Mr. and Mrs. King owned the residence at 925 East Hawthorne Street in Fort Wayne. Defendant, City of Fort Wayne, Indiana, is a municipal corporation located in Allen County, Indiana, and has the general control, supervision, management and command of its Police Department and the police officers of the City of Fort Wayne, Indiana. On October 18, 1981 individual defendants Thomas Turflinger, Kenneth Gigli, Gregory Lewis, and Douglas Haskell were all police officers employed by the City of Fort Wayne, Indiana. Lt. Gigli was the ranking officer present during the events and was in charge of the Mid-Shift Watch. Sgt. Pruitt was the patrol sergeant in charge of patrol officers on the second shift. Officer Lalone worked the second shift. Jurisdiction is present under 28 U.S.C. §§ 1343 and 1331 and is conceded by the parties. This action arises under 42 U.S.C. § 1983 and the fourth and fourteenth amendments to the Constitution.

On said date, at approximately 9:30 p.m., Clarence King was driving his automobile on Gaywood Avenue in Fort Wayne, Indiana in excess of the speed limit. While so driving his vehicle, Mr. King was observed by defendant Officer Lalone and Officer Lalone's father-in-law, Fred Richards, who was accompanying Officer Lalone as a "ride along." Officer Lalone began pur-

suit of Mr. King, following Mr. King on Gaywood Avenue. Officer Lalone was in a marked police squad car which had a revolving flashing light system installed on its roof. Officer Lalone turned on the flashing red lights located on the roof of his car as he pursued Mr. King and intermittently used the police siren to attempt to attract Mr. King's attention when the flashing red lights apparently did not alert Mr. King to the officer's presence behind him. Officer Lalone was close enough to the King vehicle to be able to read the license plate. Officer Lalone's vehicle and Mr. King's vehicle were the only two cars on Gaywood that evening and no traffic was observed by Officer Lalone on the cross streets. Mr. King turned from Gaywood Avenue onto Hawthorne Street; after Mr. King made his turn onto Hawthorne on the evening of October 18, 1981, he heard the siren and saw the lights of the police vehicle behind him. Mr. King pulled onto a parking area located in front of 925 East Hawthorne Street. The residence located at 925 East Hawthorne Street is the second house to the west of Gaywood facing Hawthorne Street. The house at 925 East Hawthorne Street was later found by Officer Lalone to be Mr. King's place of residence. None of the officers had knowledge of the ownership of the residence or the identity of plaintiff at the time.

After Mr. King parked his car in front of his residence at 925 East Hawthorne Street, he proceeded to get out of his car and stood by it. Officer Lalone got out of the marked police squad car and approached Mr. King. Officer Lalone was wearing a police uniform and Mr. King knew Officer Lalone was a police officer. Officer Lalone asked Mr. King for his driver's license and the registration to his car. Mr. King refused to give Officer Lalone his driver's license, asserting he did not do anything. Mr. King's driver's license was in his wallet. Mr. King told Officer Lalone that the vehicle registration was in the vehicle, the vehicle was locked, and Officer Lalone would have to tow the car if he wanted more information.

During this conversation with Mr. King near Mr. King's vehicle, Officer Lalone smelled alcohol on Mr. King's breath. Officer Lalone asked Mr. King if he had been drinking. Mr. King said he had had something to drink, a couple of beers. At this point, Mr. King began to walk away from Officer Lalone. Officer Lalone asked Mr. King if he was aware that driving while intoxicated was a crime in the State of Indiana. Officer Lalone also told Mr. King that he had probable cause to believe Mr. King was intoxicated and was driving while intoxicated. Officer Lalone asked Mr. King to submit to a breathalyzer test. Mr. King told Officer Lalone there was nothing wrong and there would be no test.

At this juncture, plaintiff had taken five to six steps away from Officer Lalone. Officer Lalone then informed Mr. King that a police investigation was occurring and that if Mr. King continued to walk away he could be and would be arrested for fleeing from a law enforcement officer and resisting a law enforcement officer. Mr. King continued to walk away at a fast gait. Officer Lalone ran after Mr. King and grabbed him by the arm. Officer Lalone informed Mr. King he was under arrest for fleeing and resisting. Mr. King pulled away from Officer Lalone and walked quickly into his home. The door to the residence was left ajar. Officer Lalone attempted to follow Mr. King, but decided to seek assistance from other police units before doing anything further.

Officer Lalone radioed for assistance from the front area of 925 East Hawthorne, using a hand held radio. Officer Lalone then proceeded back to his police car to get his nightstick, said car still having the revolving red lights flashing. Officer Lalone had earlier radioed police dispatch that he was pursuing a car that would not stop. Officers Turflinger, Gigli, Lewis, and Haskell all heard Officer Lalone's dispatches and responded. Officer Gigli arrived at the scene first, followed immediately thereafter by Officer Turflinger. Lt. Gigli, the ranking officer and the officer in charge of the mid-shift watch,

asked Officer Lalone for a summary of the situation.

Officer Lalone told Lt. Gigli that he attempted to make a vehicle stop of Mr. King's vehicle; when Mr. King finally did stop his vehicle, Officer Lalone had a hard time with Mr. King; Mr. King proceeded to leave the scene of a police investigation; Mr. King was told he was under arrest; and finally, Mr. King had gone into the home located at 925 East Hawthorne Street. Lt. Gigli asked Officer Lalone if he was sure Mr. King was under arrest. Officer Lalone replied that Mr. King was under arrest for fleeing and resisting. Officer Turflinger was present during the conversation between Lt. Gigli and Officer Lalone. An incident report, filed by Officer Turflinger contemporaneously with these events, mirrors Officer Lalone's and Lt. Gigli's recollections of the conversation. Officer Gigli directed Officer Lalone to go around to the back of the home. Lt. Gigli felt that an emergency existed, based on the fact that Mr. King had fled and resisted a police officer and that the officers present were operating under a policy of pursuit. Officer Turflinger also felt the officers were following established police policies.

Lt. Gigli and Officer Turflinger went to the now closed front door of 925 East Hawthorne, knocked on the door, identified themselves as police officers, and asked Mr. King to open the door and come outside. Lt. Gigli told Mr. King if he did not open the door and come outside and talk with the officers about the events, they would have to enter the house forcibly. Plaintiff said he would not open the door. Lt. Gigli told Mr. King that if he did not open the door the officers would kick in the door. Mr. King refused to open the door and told them they would have to kick it in. Lt. Gigli ordered the door broken in; he kicked the door first. Lt. Gigli operated pursuant to standard policies of the City of Fort Wayne when police officers are pursuing a suspect. Officer Turflinger also operated pursuant to the usual practices of the Fort Wayne Police Department in using force to effect sure custody of a suspect who has fled from police officers. Both officers so testified.

Mr. King was standing near the front door in the living room area. Lt. Gigli asked Mr. King his name; Mr. King gave his name. Lt. Gigli told Mr. King he was under arrest and would have to go downtown with the officers. At this time, Officer Lalone returned to the scene from the rear of the house. Lt. Gigli did most of the talking. Plaintiff was quite upset, combative, belligerent, and unhappy about the entry of the police officers into his home. The police officers did not obtain either an arrest warrant or a search warrant prior to their forcible entry of Mr. King's home on the evening of October 18, 1981.

Lt. Gigli began conversing with the plaintiff, standing approximately three to four feet from plaintiff. Lt. Gigli smelled alcohol on plaintiff's person. Mr. King refused to leave until he could call his attorney. Lt. Gigli thought that it was the wise thing to do to allow Mr. King to attempt to contact his attorney. Lt. Gigli felt that a lawyer would assist making plaintiff more aware of his rights. Allowing an arrested suspect to contact an attorney prior to his being taken to headquarters for processing is not standard operating procedure for the Fort Wayne Police Department. The officers and Mr. King proceeded to the kitchen area where Mr. King attempted to contact his attorney. By this time, plaintiff's wife, plaintiff Martha A. King and plaintiff's daughter, plaintiff Michelle E. King, had entered into the scene of events. Plaintiff Michelle King was visibly upset. Mrs. King was also quite upset by the events. Both Mrs. and Ms. King suffered emotional distress and humiliation. This distress and humiliation was caused directly by the officers' forcible entry into and thirty minutes presence in their home. Mr. King was still quite upset and belligerent and Mrs. King was asked to assist Mr. King in calling an attorney and in attempting to calm Mr. King down.

While Officers Lalone, Gigli and Turflinger were in the kitchen area with the

three plaintiffs, Officer Lewis and Sgt. Pruitt arrived. Soon after those officers, Officer Haskell arrived, having been dispatched there by the police dispatcher. At no time during the officers' presence in Mr. King's home was Mr. King alone with any one officer. A number of police officers, following procedures of self-defense, were always grouped around him. The conversation which ensued was heated and was carried on in loud voices; however, there were no racially disparaging comments made by the police officers to Mr. King. Officer Haskell took plaintiff Michelle King into the living room area in an attempt to get her away from the tense situation and to calm her down.

The officers had been in Mr. King's home approximately twenty to twenty-five minutes before the decision was made by Lt. Gigli to effect a transport of Mr. King to police headquarters. Although Mr. King kept trying, he was not able to contact his attorney during the time period. After the twenty to twenty-five minutes had elapsed, Lt. Gigli informed Mr. King that he would be transported downtown. Altogether the officers spent about thirty minutes in the home. Mrs. King informed Mr. King that she would continue to attempt to contact their attorney. Officers Lewis and Turflinger approached Mr. King to handcuff him to effect the transport. Mr. King offered little resistance to the cuffing, although he did resist at the first instance of the handcuffing. Mrs. King asked and was allowed to place shoes and a jacket on Mr. King. Officer Haskell transported Mr. King downtown to police headquarters. Any emotional distress and humiliation suffered by Mr. King came from him being taken out of his house handcuffed and having police cars parked outside his house with the flashing red lights turned on.

Mr. King arrived at police headquarters at approximately 10:30 p.m. on October 18, 1981. A voluntary breathalyzer test taken at 11:40 p.m. showed Mr. King's alcoholic content level to be .09 percent. The initial investigation of these events began at approximately 9:30 p.m. Mr. King was charged with driving while intoxicated,

fleeing a law enforcement officer, and resisting a law enforcement officer. Mr. King was found guilty in a state misdemeanor court of fleeing a law enforcement officer and resisting a law enforcement officer. He was found not guilty on the charge of driving while intoxicated.

The officers entered the King residence without possessing either an arrest warrant or a search warrant. At trial this court took judicial notice of I.C. 35–1–17–1 (Burns Code ed., Repl.1979) [now I.C. 35–33–1–5 (Burns Code ed., Supp.1983)]. This court also took judicial notice of I.C. 35–1–19–4 (Burns Code ed., Repl.1979) [repealed by P.L. 320–1983, § 25]. I.C. 35–1–17–1 defines arrest as: "the taking of a person into custody, that he may be held to answer for an offense." I.C. 35–1–19–4 provided:

An arrest may be made on any day, or at any time of the day or night. If a person arrested escape or be rescued [sic], the person from whose custody he made his escape, or was rescued, may immediately pursue and retake him, at any time and within any place in the state. To retake the person escaping, or rescued, the person pursuing may, after notice of his intention, and refusal of admittance, break open an outer or inner door or window of a building or enclosure, and shall have the same power to command assistance as is given in cases of arrest.

This court also takes notice of the following statues: I.C. 35–1–19–1 (Burns Code ed., Repl.1979) [repealed by P.L. 320–1983, § 25], I.C. 35–44–3–3 (Burns Code ed., Supp.1983), I.C. 9–1–4–5 (Burns Code ed., Repl.1980), I.C. 9–1–4–40 (Burns Code ed., Repl.1980), I.C. 9–4–1–54(b) (Burns Code ed., Repl.1980) [repealed, now I.C. 9–11–2–2 (Burns Code ed., Supp.1983)], and I.C. 7.1–5–1–3 (Burns Code ed., Repl.1984).

I.C. 35–1–19–1 provides, in part,

"[a]n arrest is made by an actual restraint of the person by the defendant, or his submission to the custody of the officer[.]"

I.C. 35–44–3–3(a) states, in pertinent part:

A person who knowingly or intentionally:
(1) forcibly resists, obstructs, or inter-

feres with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of his duties as an officer; ... (3) flees from a law enforcement officer after the officer has, by visible or audible means, identified himself and ordered the person to stop; commits resisting law enforcement, a class A misdemeanor.

I.C. 9–1–4–5 provides that a registration to a vehicle "shall be carried at all times in the vehicle to which it refers, or shall be carried by the person driving or in control of such vehicle, who shall display the same upon demand of a police officer." I.C. 9–1–4–40(b) provides, in pertinent part: "Every person holding a permit or license ... shall have such permit or license in his immediate possession at all times when driving or operating a motor vehicle, and shall display the same upon demand of any court or any police officer, authorized by law to enforce motor vehicle regulations."

I.C. 9–4–1–54(b)(1)(A) provides that a person who operates a vehicle while intoxicated commits a class A misdemeanor. I.C. 7.1–5–1–3 provides that "[i]t is a class B misdemeanor for a person to be in a public place ... in a state of intoxication."

The defendant police officers seized Mr. King's car and transported it to a police compound after Mr. King's arrest and transport to police headquarters. All of the acts of the individual defendants were done in the course and scope of their employment as police officers by the City of Fort Wayne, Indiana. The defendant, City of Fort Wayne, Indiana, has no manual or written instructions to police officers relating to effecting arrests for misdemeanors without a warrant.

The plaintiffs' special damage claims consist of: (1) the damage to the door from the breaking of $467.00; (2) the charge to retrieve the towed car of $47.00; and (3) the lost wages for one day's work for Mr. King of $90.00. The plaintiffs request $10,-000.00 in general damages, plus punitive damages.

*Conclusions of Law*

During the final arguments in this matter, a dispute arose as to whether the issue of the good faith of the individual police officers had been raised by the pleadings. Defendants also asserted that the issue of good faith allowing a qualified immunity for individuals under section 1983 only needed to be pleaded as an affirmative defense under the case law in the United States Court of Appeals for the Fifth Circuit. Defendants then moved for an amendment of the pleadings to conform to the evidence which had been introduced relating to the issue of the individual officer's good faith in order that the case could be decided on the merits.

■ The issue of good faith had not been raised by the pleadings filed in this case prior to trial. Contrary to defendants' contention that good faith leading to a qualified immunity must only be pleaded as an affirmative defense in the Fifth Circuit, the United States Supreme Court in 1980 held that the issue of a qualified good faith immunity on the part of individuals must be asserted as an affirmative defense by the individual officials. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The United States Court of Appeals for the Seventh Circuit placed the burden of pleading a good faith qualified immunity defense on defendants prior to *Gomez*. *Tritsis v. Backer*, 501 F.2d 1021, 1022–23 (7th Cir.1974). *See Gomez*, 446 U.S. at 638 n. 5, 100 S.Ct. at 1922 n. 5. The Seventh Circuit follows the *Gomez* rule. *E.g.*, *Lojuk v. Quandt*, 706 F.2d 1456 (7th Cir.1983). The burden of pleading a qualified good faith immunity was on defendants. The defendants did not plead the affirmative defense of qualified good faith immunity. *See* Fed.R.Civ.P. 8(c).

■ However, defendants moved, pursuant to Fed.R.Civ.P. 15(b) to amend the pleadings as may be necessary to cause them to conform to the evidence and to raise the issue of the affirmative defense of qualified good faith immunity on the part of the individual officers. The Seventh Circuit has a liberal policy respecting

amendments to pleadings; this court follows the policy of deciding a case on its merits and not on the basis of technicality. *See Green v. J.C. Penney Auto Insurance Co.*, 722 F.2d 330, 333 n. 3 (7th Cir.1983). The issue of the individual officers' good faith, although not raised by the pleadings, was tried to this court by the implied consent of the parties. Defendants moved to amend the pleadings to cause them to conform to the evidence at final arguments. This court concludes that it will allow the pleadings to be amended to include the affirmative defense of qualified good faith immunity on the part of the individual officers. The court finds that the merits of the action will be served by allowing the amendment and that the amendment of the pleadings will not prejudice plaintiffs in maintaining their action. Defendants' motion to amend the pleadings is hereby granted.

This case centers around the basic issue of whether the entry of the police officers into the plaintiffs' residence violated their fourth amendment rights. Plaintiffs contend the entry into their home was illegal because the entry violated their fourth[1] and fourteenth[2] amendment rights and section 1983.[3]

The suit before this court is controlled, in part, by the test enunciated in *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Monell* dictates:

We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. *Id.* at 694, 98 S.Ct. at 2037–38.

The suit insofar as it relates to the individual police officers individually, is controlled by the issue of the officers' entitlement to a qualified immunity based on good faith. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), set out the test:

[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738. The test is an objective one. The officers' individual liability will be addressed and determined after addressing the case in the context of *Monell.*

This case, in large measure, turns on the presence of proof on the issues of (1) whether there has been a deprivation of a constitutionally protected interest of plaintiffs, and (2) if so, whether the deprivation was caused by an official policy, custom or

**1.** The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. Const.amend. IV.

**2.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const.amend. XIV § 1.

**3.** Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

usage of the City of Fort Wayne. *Monell,* 436 U.S. at 690, 98 S.Ct. at 2035–36; *Powe v. City of Chicago,* 664 F.2d 639, 643 (7th Cir.1981).

### A. Deprivation of Constitutionally Protected Interest.

▪ "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). Warrantless seizures are per se unreasonable but there exists "a few specifically established and well delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). These exceptions are generally characterized as "exigent circumstances." *Dorman v. United States,* 435 F.2d 385 (D.C.Cir.1970) *cited with approval in Payton,* 445 U.S. at 587–88, 100 S.Ct. at 1380–81; *United States v. Robertson,* 606 F.2d 853 (9th Cir.1979). The exceptions to the per se unreasonable rule are applied on a case-by-case basis, looking specifically at the factual scenario involved. *United States v. Acevedo,* 627 F.2d 68 (7th Cir.1980), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482; *United States v. Blasco,* 702 F.2d 1315 (11th Cir.1983). "Those asserting the propriety of their [warrantless] entry bear a heavy burden of showing they had an urgent need to cross the threshold [of a residence] without a warrant." *Acevedo,* 627 F.2d at 70. Exigent circumstances cannot be created by police officers to justify warrantless searches. *United States v. Thompson,* 700 F.2d 944 (5th Cir.1983). *See United States v. Rosselli,* 506 F.2d 627 (7th Cir.1974). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton,* 445 U.S. at 590, 100 S.Ct. at 1382. *Accord McKinney v. George,* 726 F.2d 1183 at 1188 (7th Cir. 1984) ("[T]he Fourth Amendment has been interpreted to require that the police have a warrant if they want to arrest a man in his home.").

▪ Exigent circumstances did not exist. The right of the plaintiffs to be secure in their home, protected by the strictures of the fourth amendment, was violated. The officers involved acted pursuant to an unwritten policy or custom of the City of Fort Wayne. The officers believed it was proper for them to act under a policy of pursuit and pursuant to a state statute, even though none of the six potential violations involving Mr. King were felonies. The six arguable violations committed by Mr. King in the front yard of his residence were all misdemeanors. Defendants could not cite nor could this court discover any case involving misdemeanors where a forcible, nonconsensual entry into a residence to effect a seizure of the person within without a warrant was found to be lawful. This case involves the nonconsensual, forcible, warrantless entry of police officers into a private residence to seize someone who had arguably committed misdemeanors in a police officer's presence.

Defendants place reliance on *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), which held that a suspect could not defeat an arrest begun in a public place by escaping to a private place. *Santana* involved a felony. The United States Supreme Court found that *Santana* followed from the holding of *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), which held that warrantless public arrests where probable cause existed were proper. *Watson* also involved a felony. The *Watson* Court specifically noted that the case did not present the question of whether and under what circumstances an officer could enter a suspect's home to make a warrantless arrest. *Watson,* 423 U.S. at 418 n. 6, 96 S.Ct. at 825 n. 6. Defendants' reliance on *Santana* and *Watson* is misplaced. *Watson* did not decide the question of entry into a suspect's home to make a warrantless arrest; *Payton* decided that question. The *Santana* holding is a narrow one; *Santana* holds that a warrantless felony arrest

begun in a public place cannot be defeated through the escape of the suspect into a private place. The operative word in both *Watson* and *Santana* is "felony."

Mr. King committed six arguable misdemeanor violations in Officer Lalone's presence. Officer Lalone could have obtained arrest warrants for Mr. King for arguable violations of I.C. 35–44–3–3(a)(1), I.C. 35–44–3–3(a)(3), I.C. 9–1–4–5, I.C. 9–1–4–40(b), I.C. 9–4–1–54(b), and I.C. 7.1–5–1–3. Those statutes provide, respectively, that a person who violates those statutes commits the misdemeanors of: resisting a law enforcement officer, fleeing a law enforcement officer, failing to produce registration upon demand of a police officer, failing to produce a driver's license upon demand of a police officer, operating a vehicle while intoxicated, and being publicly intoxicated. All of these potential misdemeanors were committed in Officer Lalone's presence and Officer Lalone had sufficient information to swear out affidavits in support of these alleged violations which could then have been submitted to a detached and impartial judicial officer in support of arrest warrants.[4] Even though it was a Sunday night, there was not such a sense of urgency or seriousness about these alleged violations which could mitigate the failure of the officer to obtain proper arrest warrants.

■ A thread which runs throughout defendants' justification of their warrantless, forcible entry into Mr. King's home is that Officer Lalone had placed Mr. King under arrest prior to his entry into his residence, defendants were justified in entering Mr. King's home and "re-taking" him, by force if necessary, and thus, no deprivation of a constitutionally protected interest occurred. The court is unpersuaded. The court concludes that Officer Lalone did arrest Mr. King in his front yard for the misdemeanors of fleeing and resisting a law enforcement officer. A reasonable person in Mr. King's situation would not have believed that he was free to leave. There had been a physical touching of Mr. King and there had been language and tone of voice used indicating that compliance with Officer Lalone's request might be compelled. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). *Accord United States v. $84,000 United States Currency,* 717 F.2d 1090 (7th Cir. 1983); *United States v. $73,277 United States Currency,* 710 F.2d 283 (7th Cir. 1983); *United States v. Moya,* 704 F.2d 337 (7th Cir.1983), *vacated mem. on other grounds,* —— U.S. ——, 104 S.Ct. 418, 78 L.Ed.2d 355 (1983); *United States v. Black,* 675 F.2d 129 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). *See also Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Armstrong v. State,* 429 N.E.2d 647 (Ind.1982); I.C. 35–1–19–1 (now repealed). However, where the matters involved in a seizure are misdemeanors, a seizure of a suspect in a public place is not a sufficient exigent circumstance to justify a forcible, warrantless, nonconsensual entry into a private residence.[5]

---

4. There is a question, a legal question, whether Mr. King, standing in his front yard, could be found to be in a public place within the meaning of I.C. 7.1–5–1–3. *See Bridgewater v. State,* 441 N.E.2d 688 (Ind.App.1982); *State v. Culp,* 433 N.E.2d 823 (Ind.App.1982); *Cornell v. State,* 398 N.E.2d 1333, 1339 (Ind.App.1980) (Buchanan, C.J., dissenting); *State v. Sowers,* 52 Ind. 311 (1876). However, Officer Lalone was unaware the yard was, in fact, owned by Mr. King and thus could have assumed that, given Mr. King's observed intoxicated state, Mr. King was intoxicated in a public place. There was enough probable cause to take the information in the form of an affidavit before an impartial and detached judicial officer who could then decide

whether a warrant should issue for Mr. King for an alleged violation of I.C. 7.1–5–1–3.

5. Also important to note in this case is that the defendant police officers did not know who owned the residence into which Mr. King entered and they entered anyway. *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), decided April 21, 1981, held that even with an arrest warrant for a suspect, police officers must have a search warrant to enter a third person's home. The facts here could lead to the inference that the residence into which Mr. King went was not his, but belonged to a third person. The officers needed, at the very minimum, an arrest warrant for

Defendants' proposed exigent circumstance of pursuit following misdemeanor violations in an officer's presence and initial seizure of the suspect fails as a sufficient justification for defendants to escape the per se unreasonable rule applicable to the fourth amendment. Defendants violated plaintiffs' fourth amendment right. Grave offenses, particularly violent offenses, were not involved. Mr. King was not reasonably believed to be armed. Nor was there a likelihood that Mr. King would escape if not swiftly apprehended. *See Dorman,* 435 F.2d at 392–93.

The circumstances of this case would be very different if the offenses involved were felonies. There is a clear and distinct line drawn between misdemeanor offenses and felony offenses. Even if this case involved felony offenses, there is a real question as to whether sufficient exigent circumstances would exist which would allow the police officers to make a warrantless, forcible, nonconsensual entry into Mr. King's home. It is clear to the court that no exigent circumstances existed such that warrants could not and should not have been obtained. The police officers knew where Mr. King was; they could have stationed cars outside the house in the event Mr. King exited the home; if he had exited, the officers could have taken him into custody. The officers had the car in which Mr. King was driving; they could have obtained a license check and/or towed the vehicle. The police did, in fact, tow the vehicle after Mr. King's arrest. Mr. King was not armed. Mr. King was not in the possession of evidence which could be destroyed which could be crucial to a criminal case. Finally, the offenses involved were of a misdemeanor nature; the nature of the offenses involved was simply not serious enough to justify the violation of the sanctity of Mr. King's home. There can be no doubt but that plaintiffs suffered a deprivation of a constitutionally protected interest.

B. *Policy of City of Fort Wayne.*

■ Having determined there was a deprivation of a constitutionally protected right, the issue of responsibility and liability for that deprivation arises. Was the deprivation caused by an official policy, custom or usage of the City of Fort Wayne, Indiana which would render it liable?

The act of entering Mr. King's home forcibly and without a warrant was affirmative. The act was taken pursuant to an admitted policy of the City of Fort Wayne, Indiana. The City admitted that it had no written manuals or orders in force on October 18, 1981 which related to effecting arrests for misdemeanors without a warrant. The City further admitted that no such manuals and orders existed. The fact that the City had no written policy does not erase the fact that a policy existed nonetheless. *Monell* specifically recognizes that "local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2036. To prevail against the City, plaintiffs must show that a causal link exists between their deprivation of a constitutional interest by the defendant police officers and the unwritten custom or usage of the City of Fort Wayne which allows police officers to make warrantless, forcible, nonconsensual entries into private residences to effect arrests for misdemeanors. Plaintiffs have shown such a causal link.

■ The act of entry into plaintiffs' home was affirmative. Plaintiffs are not alleging liability exists on Fort Wayne's part because of passive acquiescence by Fort Wayne in the actions of its police officers. Plaintiffs' causal link between their deprivation and an official custom or usage of Fort Wayne is the allegation that the entry into their home was performed by the police officers according to established customs or usages of the City of Fort Wayne. Municipalities cannot be held liable under section 1983 under a *responde-*

Mr. King before they entered the residence at 925 East Hawthorne Street.

*at superior* theory for the isolated torts of its employees. *Monell,* 436 U.S. at 691–92, 98 S.Ct. at 2036; *Powe,* 664 F.2d at 649. *See also Languirand v. Hayden,* 717 F.2d 220 (5th Cir.1983).

[A] municipality may be cast in damages only for its own acts or omissions, and a municipality "acts" by establishing or countenancing policies or practices which its employees are expected to follow in performing their duties. This predication of liability upon fault means that when an individual official breaks with official policy, and in doing so violates the constitutional rights of another, then that official, and not the municipality whose policies he breached, should be made to bear the liability. Conversely, when an official performs his duties according to established policies or practices, but in doing so violates another's rights, then it is the municipal entity, which established or perpetrated the policies, that should be held liable.

*Powe,* 664 F.2d at 649. Further, while the individual police officers may be entitled to a qualified immunity based on good faith, the City of Fort Wayne does not possess and is not entitled to any qualified immunity based on good faith. *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

The City of Fort Wayne is liable for plaintiffs' deprivation of fourth amendment rights. There is no evidence in the record that Lt. Gigli and Officer Turflinger were not telling the truth in unequivocally stating that in entering plaintiffs' home to effect an arrest for a misdemeanor they were acting pursuant to official Fort Wayne policy regarding pursuit. It is of no moment that the City of Fort Wayne had no written policy. It is enough for liability under *Monell* that a city be shown to have a custom or usage that is followed by its employees in performing their duties. Here, the custom, usage or practice was the policy of pursuit into a resident's private home to effect an arrest even where the offense involved was a misdemeanor. The City of Fort Wayne made no distinction to its officers between a misdemeanor offense and a felony offense. The preponderance of the evidence before this court is that the police officers took the actions they did pursuant to a custom, policy or practice, albeit unwritten, of the City of Fort Wayne. Plaintiffs have established a sufficient causal link between that policy of the City of Fort Wayne and the constitutional deprivation which occurred.

The City of Fort Wayne is liable for plaintiffs' deprivation of constitutionally protected rights. The fact that there was an Indiana statute in effect in 1981 upon which the defendant police officers also relied is irrelevant to the liability of the City. Reliance upon such a statute goes only to a raised defense of qualified immunity based on good faith. The City is not entitled to any good faith immunity or defenses. *Owen,* 445 U.S. at 622, 100 S.Ct. at 1398.

### C. Individual Defendant Police Officers.

Qualified good faith immunity is available to police officers acting in their official capacities. *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). *See also Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Lenard v. Argento,* 699 F.2d 874 (7th Cir.1983); *Brubaker v. King,* 505 F.2d 534 (7th Cir.1974). The test for determining good faith of a person or persons acting in their official capacity is an objective one. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Public officials acting in their official capacities "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* 102 S.Ct. at 2738. Plaintiffs claim violation of the fourth and fourteenth amendments to the Constitution. While *Harlow* does not address specifically whether this objective rule applies to state officials being sued under section 1983, it sets out a very broad hint that it would make no distinction between suits against state officials and suits against federal officials in applying

the objective test for determining good faith. *Id.* at 2738 n. 30. *See also Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). The Seventh Circuit applies the *Harlow* test to suits involving state officials being sued for damages under section 1983. *Johnson v. Brelje,* 701 F.2d 1201 (7th Cir.1983); *Crowder v. Lash,* 687 F.2d 996 (7th Cir.1982).

■ This court, applying the *Harlow* test to the facts of this case, concludes that the individual police officers proceeded in good faith in their entry into plaintiffs' home and in the arrest of Mr. King. The individual police officers are entitled to invoke immunity from this suit for civil damages under section 1983 for alleged violations of the fourth and fourteenth amendments. The individual police officers involved acted pursuant to a state statute which seemed to authorize the actions the police officers took on the evening of October 18, 1981 and pursuant to official policy, custom, practice or usage of the City of Fort Wayne. *See Ayler v. Hopper,* 532 F.Supp. 198 (M.D.Ala.1981); *Monell,* 436 U.S. at 658, 98 S.Ct. at 2018. The presence of the state statute and the policy of the City of Fort Wayne operates to allow the individual defendant police officers to assert successfully a good faith defense in this matter. In view of the presence of those two factors, the individual police officers' conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

### D. Damages.

Plaintiffs, having proved by a preponderance of the evidence that their fourth amendment rights were violated and that the City of Fort Wayne is liable for those deprivations, are entitled to recover damages. Mr. and Mrs. King, as owners of the house, shall recover the special damage claim of the damage to the door from the forced entry of $467.00. No other special damage claims will be awarded because all the other special damage claims arose from Mr. King's actions. The amount of general damages to be assessed is more problematical.

■ Much of what occurred in this case flowed directly from Mr. King's conduct. Mr. King had an obligation, indeed a heavy burden, to be civil and accommodating to the police officer when the police officer requested information of Mr. King. Indiana law requires the production of a driver's license and vehicle registration upon the request of a police officer. Persons in plaintiff's position are given substantial protections under the Constitution, in particular under the fourth amendment. It was a violation of the fourth amendment for the individual police officers, acting pursuant to policy and statute, to enter Mr. King's residence forcibly. The thirty minutes of the police officers' presence in Mr. King's home which followed the breaking of the door was likewise violative of the Constitution because it flowed necessarily from the wrongful breaking of the door. However, all other events and incidents which occurred on October 18, 1981 flowed from Mr. King's own conduct. Mr. King arguably committed at least five and possibly six misdemeanor violations in Officer Lalone's presence. Except for the breaking of the door and the subsequent thirty minutes in the house, the police were not responsible for anything which occurred; Mr. King was responsible. It was Mr. King who refused to cooperate with reasonable legal requests of Officer Lalone; it was Mr. King who fled and resisted a law enforcement officer who was attempting to do his duty. Mr. King brought the events of October 18, 1981, largely, on himself. The whole incident could have been avoided if Mr. King had obeyed the laws regarding production of licenses and registrations.

■ In order to recover anything more than nominal damages in a section 1983 action for injuries caused by deprivation of constitutional rights, an actual injury must be shown; actual injury cannot be presumed from a deprivation of constitutional rights. *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978); *Kincaid v. Rusk,* 670 F.2d 737,

745–46 (7th Cir.1982). *Accord Saxner and Cain v. Benson,* 727 F.2d 669 at 672 (7th Cir.1984); *Crawford v. Garnier,* 719 F.2d 1317 (7th Cir.1983); *Freeman v. Franzen,* 695 F.2d 485 (7th Cir.1982). The Seventh Circuit has enumerated some of the elements of compensible injury: "emotional distress, humiliation, personal indignity and physical injury." *Crawford,* 719 F.2d at 1324. Other factors include mental distress and embarassment. *Freeman,* 695 F.2d at 493. In the absence of a showing of some of these elements of compensible injury, a plaintiff who has shown a deprivation of constitutional rights will be entitled to an award only of nominal damages. "Damages should not go beyond adherence and become a windfall." *Lenard,* 699 F.2d at 890.

Mr. King has made a showing only of nominal damages for the deprivation of his fourth amendment right. The emotional distress, humiliation and anguish Mr. King suffered came, by his own testimony, from being led out of the house in handcuffs and the presence of police cars with flashing red lights in front of his home. Again, this court reiterates that those embarassments were brought on by Mr. King himself. There was no testimony Mr. King suffered more than nominally from the forcible entry into the home by the officers and their presence therein. Mr. King is entitled to the nominal sum of One Dollar ($1.00). The officers' behavior once inside the house was exemplary; they allowed Mr. King to call his attorney, they asked Mrs. King to assist them, and they cooperated as best they could with Mr. King. The officers went out of their way to be polite to Mr. King, particularly in light of the manner in which Mr. King behaved toward them.

Mrs. King is entitled to compensatory damages. She has shown by a preponderance of the evidence that she suffered emotional distress, humiliation, personal indignity, and mental distress and embarassment caused by the forcible entry into her home and the continued presence in her home by the police officers. Mrs. King was, in effect, an innocent bystander. Her fourth amendment right was violated and

she has shown that she is entitled to be compensated for that violation. The trauma of having officers break down her door and enter her home is compensable. The court finds that Mrs. King is entitled to compensatory damages in the amount of Five Hundred Dollars ($500.00). Mr. King's daughter, Michelle King, has also shown that she suffered a violation of her fourth amendment rights and is entitled to damages. Of all of the actors on the scene of events of October 18, 1981, it was Ms. King who was most affected by the forcible entry by and presence of the police officers in her home. It has been shown by more than a preponderance of the evidence, including the fact an officer had to take her from the immediate scene, that Ms. King suffered extreme emotional distress, humiliation, trauma and embarassment resulting from the events. The court finds that Ms. King should be compensated for her injury in the amount of One Thousand Dollars ($1,000.00).

█ Plaintiffs also request the court to award punitive damages. The Supreme Court held in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), that governmental units are not subject to punitive damages in section 1983 suits. As the court has found only the governmental unit of the City of Fort Wayne liable, punitive damages are not available to plaintiffs in this matter.

### E. Attorney Fees.

█ Plaintiffs seek an award of attorney fees if successful. Section 1988 of Title 42 of the United States Code so provides, in pertinent part:

> In any action or proceeding to enforce a provision of §§ 1981, 1982, 1983, 1985, and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, ... a reasonable attorney's fee as part of the costs.

The court finds that costs and attorney's fees should be assessed against the defendant City of Fort Wayne in this action. The

considerations relevant to computing a reasonable attorney's fee award have been set forth by the United States Court of Appeals for the Seventh Circuit in *Waters v. Wisconsin Steel Works*, 502 F.2d 1309 (7th Cir.1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). The time spent by the attorney is not to be simply multiplied by a billing rate. The primary factors in the computation include, not only the time reasonably spent on the case, but also the value of the attorney's work, given local legal fees, and his abilities, reputation and degree of success in the case. Also relevant is whether the attorney's efforts in this case precluded him from working on other legal matters. These factors are drawn from the sections of the Code of Professional Responsibility that describe how an attorney should determine the fee he may properly charge a client, particularly D.R. 2–106.

While plaintiffs' request for an award of attorney's fees will be granted, the court cannot at this time, on the basis of the record before it, compute the proper amount of such an award. Plaintiffs will therefore be directed to file, not later than twenty (20) days from the date of this judgment, a more complete breakdown and explanation of charges and time and such other materials supporting the request for attorney's fees as is required by *Waters*. The amount of such an award will be set by further order of the court. A copy of plaintiffs' showing, in addition to the affidavit filed during trial, relating to attorney's fees, shall be served on defendants, and defendants shall have ten (10) days from the date of filing to respond or otherwise challenge the showings and fees set forth.

### Conclusion

Plaintiffs have established by a preponderance of the evidence that the breaking and entering of their home was a violation and deprivation of their fourth amendment rights to be secure in their residence, done under color of state law by municipal officials acting solely in their official capacities. Accordingly, a violation of section 1983 has been shown, thus entitling Mr. and Mrs. King to special damages for damages to the door of $467.00, Mr. King to nominal damages of $1.00, Mrs. King to compensatory damages of $500.00 and Ms. King to compensatory damages of $1,000.00. The City of Fort Wayne is liable to plaintiffs for these amounts. Plaintiffs shall also be entitled to costs and to attorney's fees to be awarded by further order of this court.

This memorandum of decision contains the court's findings of fact and conclusions of law pursuant to rule 52 of the Federal Rules of Civil Procedure. *See Rucker v. Higher Educational Aids Board*, 669 F.2d 1179, 1183–84 (7th Cir.1982).