**Patrick Brian CRAWFORD, Petitioner-Appellant,**

v.

**Robert C. GARNIER, Respondent-Appellee.**

No. 80–2323.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1983.

Decided Sept. 26, 1983.

---

Grant F. Langley, Asst. City Atty., Milwaukee, Wis., for petitioner-appellant.

Michael A. Mesirow, Milwaukee, Wis., for respondent-appellee.

Before BAUER, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and MARSHALL, District Judge.*

PER CURIAM.

This is an action brought by plaintiff, Patrick Brian Crawford against defendant Robert C. Garnier, under 42 U.S.C. § 1983 for damages for the violation of plaintiff's first amendment right of free speech. The case was tried to a jury which awarded plaintiff $44,700 in compensatory damages and $25,300 in punitive damages. Timely

* The Honorable Prentice H. Marshall, United States District Judge for the Northern District of Illinois, is sitting by designation.

post-trial motions were made by defendant which the trial court carefully considered and denied, with one exception: the court ordered a remittitur of $12,650 with respect to the punitive damages which plaintiff accepted. Defendant has appealed.

Plaintiff graduated from college in June, 1971. In the fall of that year he enrolled in graduate school at the University of Wisconsin-Milwaukee. During the 1971–72 school year, he worked as a research assistant for one of his professors. In the late spring of 1972, the grant under which he was being compensated expired and plaintiff found himself unemployed. He obtained a part-time job doing "landscaping" which paid $2.25 an hour. He was able to work 20–30 hours a week for approximately two weeks.

Plaintiff needed more than part-time minimal compensation employment. In June, 1972 he sought work with the City of Milwaukee. He went to the personnel office at city hall and from there was directed to the Emergency Employment Act (42 U.S.C. §§ 4871 et seq.) office in the same building.

At the emergency employment office he completed an application describing his educational and work history and stated that he was currently unemployed but had worked four days prior to completing the application. He was assigned to an emergency employment personnel analyst named Johnson who examined the application and told plaintiff that there was a requirement of being unemployed for seven days prior to a person being eligible for employment. Plaintiff started to leave, he was actually walking toward the door, when Johnson called him back. Johnson said to plaintiff, "Look, you've almost got 1½ college degrees, you're not really employed, you have been working part-time four days earlier, making $2.25 an hour ... that just a part-time job while you're looking for employment." Tr. 45. Johnson told plaintiff to fill out another application and state that he had quit the part-time job a week or two earlier.

Plaintiff questioned Johnson about the inaccuracy of the suggested statement and Johnson replied, "The program frequently has people ... that modify their applications so they'll fit into the guidelines.... It's a frequent occurrence." Tr. 46. Johnson told plaintiff it was a "technicality". *Id.*

Accordingly, plaintiff filled out a second application which recited his work history and stated that he had not been employed for two weeks.

Johnson said that he couldn't promise plaintiff anything because it was a tight job market and there were many people looking for work. He said there were, however, certain positions that might require a college degree and that plaintiff should give him a call in a few days to see if there was an opening. Plaintiff did as he was told and called Johnson a few days later. Johnson told him to call back in another day or two, which plaintiff did. Johnson again reported that he had nothing and that plaintiff should call back. On the third call, Johnson stated that the only thing available was a job as a forestry aide in the forestry department doing general labor paying $3.94 an hour. Plaintiff agreed to take the job. He was told to report to the forestry department the following Monday, which he did. Altogether, it took plaintiff about a week and a half, from the time of his initial interview with Johnson, to obtain a job.

Plaintiff worked with the forestry crew for about six months doing general labor. He encountered several frightening experiences in which co-workers threatened each other with weapons; he observed drug and alcohol abuse on the job, absenteeism, nonwork, and laziness.

In late 1972, he was transferred to the public museum. In April 1973, he was assigned to the legislative reference bureau where he remained until his discharge, on April 4, 1974.

While working with the forestry crew, his work evaluations were fair. During the year he was with the legislative reference bureau, however, his work evaluations were excellent ("one of the best seen") and very

good ("exceeds requirements"). PX 15A & Z.

Plaintiff expected to remain at the legislative reference bureau and eventually to secure permanent employment with the city. His supervisor at the bureau recommended that he be placed in regular city employment. Plaintiff could reasonably have expected to find regular employment with the city or be carried over to the Milwaukee program under the Comprehensive Employment Training Act which followed the Emergency Employment Act.

While plaintiff was working at the legislative reference bureau, he was doing some independent research at the University of Wisconsin-Milwaukee. He decided to write a paper about the Emergency Employment Program consisting of some statistical information and his own experiences. Plaintiff wrote the paper and submitted it to his supervisor at the legislative reference bureau, who reviewed it and stated that with some editing it would be fit for publication. The supervisor was also the publisher of a small magazine, *The Northern American Mentor Magazine.*

Plaintiff submitted his paper for his course at the University as well as to the magazine. It was published in the Winter 1973 issue. The paper consisted primarily of plaintiff's experiences with the emergency employment program in Milwaukee.

As published, the paper was entitled, "Why Me? or, How Did a Nice Guy Like Me Ever End Up Being Employed in a Program Like This? or, What is it Really Like to Participate in the Emergency Employment Act in Milwaukee?" The article was critical of the administration of the emergency employment program in Milwaukee. In the article plaintiff said, "After reviewing my application, the interviewer told me I could not be hired for the program.... Applicants could have no other job within seven days prior to filing an application; I was still employed as a landscaper.... When I was about to leave his office, he told me to fill out another application and not mention the landscaping job. He told me to call him two days later, at which time

he told me to report to the public works forestry station for work on the following Monday." PX 16, pp. 73–74.

On April 3, 1974 defendant Garnier, the personnel director for the City of Milwaukee, saw the article for the first time. He discussed it with his associate, Dana Warren, who had been responsible for the operation of the emergency employment program in Milwaukee. At about noon on April 4, Garnier summoned plaintiff to his office. Garnier's testimony regarding his familiarity with the contents of the article was equivocal, but it is undisputed that, on April 4, during his meeting with plaintiff, Garnier had the entire article before him.

The meeting between plaintiff and Garnier was also attended by Warren. It lasted somewhere between 10 and 30 minutes. Garnier confronted plaintiff with the article and directed his attention to the material dealing with plaintiff's application. He asked plaintiff if those statements were true. Plaintiff said that they were. Garnier thereupon advised plaintiff that he should clear out his desk, that he was terminated effective 4:45 p.m. that day, because he had submitted a false employment application and, because he was ineligible to participate in the emergency employment program in view of the fact that he had been employed within seven days of his application. The written notice of termination read, "Reason for termination: Falsification of previous employment information on a City of Milwaukee employment application form, the content of which disqualifies you from participation in the federally funded Emergency Employment Act Program." PX 8.

After a series of employment frustrations, plaintiff eventually obtained work at the University of Wisconsin-Green Bay as a lecturer. About three years after his discharge, he brought this action.

With the exception of defendant's exhibit 1 consisting of the regulations of the United States Department of Labor regarding the Emergency Employment Act of 1971, all of the evidence in the case was adduced by plaintiff. He testified in his own behalf,

examined defendant adversely, read the deposition of defendant's colleague, Warren, and called seven other witnesses including his superior at the legislative reference bureau. So it was that the case went to the jury for all practical purposes on plaintiff's case.

The trial court submitted a special verdict to the jury in respect to which no objection is raised. The jury responded "yes" to the question, "Were the critical comments contained in the plaintiffs' article on the E.E.A. program a substantial or motivating factor in the decision of the defendant, Robert C. Garnier, to terminate the plaintiff's employment?"

The jury responded, "no" to the question, "At the time the defendant terminated the plaintiff's employment, were there any other substantial or motivating factors which would have led him to terminate the plaintiff in the absence of the critical comments contained in the plaintiff's article?"

The jury answered affirmatively that defendant's termination was the proximate cause of injury to the plaintiff. It also found specially that the defendant had acted "maliciously, wantonly or oppressively in terminating the plaintiff's employment."

The jury was then asked to find particularly the amounts of money that would reasonably compensate plaintiff for whatever losses he may have suffered as a consequence of the termination of his employment. The jury responded past loss of wages, $17,000; past loss of fringe benefits, $800; past out-of-pocket costs, $900; injury to reputation, $11,000; actual pain and suffering, $5,000; injury to civil rights, $10,000.

Finally, the jury, having found that defendant had acted maliciously, wantonly or oppressively, assessed punitive damages in favor of the plaintiff and against the defendant in the amount of $25,300. As previously noted, the district court ordered a remittitur of the punitive damages to $12,650 which plaintiff accepted.

In this court, defendant urges (1) that he established, as a matter of law, that plaintiff would have been dismissed even in the absence of his protected first amendment activity, (2) that the trial court erred by permitting plaintiff to testify to the extrajudicial statements of Johnson, the employment analyst, and (3) that the trial court erred in submitting various elements of damage to the jury.

I

Defendant does not contend that plaintiff's article was not a comment on a matter of public concern entitling it to first amendment protection. *Pickering v. Board of Education,* 391 U.S. 563, 571–572, 88 S.Ct. 1731, 1736, 20 L.Ed.2d 811 (1968); *Keyishian v. Bd. of Regents of University of State of New York,* 385 U.S. 589, 605–606, 87 S.Ct. 675, 684–685, 17 L.Ed.2d 629 (1967); Cf. *Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Rather, defendant argues that, as a matter of law, he was obliged to terminate plaintiff's employment when he learned that plaintiff had made misstatements in his employment application. Thus, defendant urges that, as a matter of law, the jury could not have found that there was no other substantial or motivating factor which would have led defendant to terminate plaintiff in the absence of the critical comments contained in the plaintiff's article.

Defendant's argument is tortured. He asserts that under the Emergency Employment Act, the city was obliged to give priority to unemployed persons as distinguished from underemployed persons, and that this same priority was carried forward in the regulations of the Department of Labor relating to the Act. Yet he acknowledges that the Act provided for the employment of underemployed as well as unemployed individuals as did the regulations. 42 U.S.C. §§ 4871 et seq.; DX 1. He claims that the city, through his office, decided to hire only unemployed individuals. Yet the city's grant application stated that the city would conduct its program "in order to provide unemployed and underemployed persons" with employment and training.

PX 13, p. 2. Finally, he totally ignores the advice given plaintiff by his subordinate, Johnson, at the time plaintiff applied.

In short, as the district court held in its post trial opinion, there were issues of fact with regard to the circumstances surrounding defendant's employment and termination. Defendant was not under a legal obligation to terminate plaintiff. Of course the evidence showed that defendant was aware of the fact that plaintiff submitted a second application which did not accurately state his employment history and the issue was submitted to the jury as to whether that fact was another substantial or motivating factor which would have led defendant to terminate plaintiff. The jury, having heard all of the evidence, answered that question in the negative. And substantial evidence supports the jury's verdict.

■ The jury was correctly instructed in accord with the shifting burden of proof prescribed by the Supreme Court in *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and defendant does not contend otherwise. The jury heard testimony of the circumstances of plaintiff's termination; the proximity of it in relation to defendant's awareness of the article; the fact that defendant had the entire article before him at the time he terminated plaintiff; the fact that defendant had discussed the article with his colleague, Warren, shortly before summoning the plaintiff to his office. The jury also took into consideration the fact that defendant made no inquiry of plaintiff regarding the advice plaintiff had received from defendant's subordinate, Johnson. In short, the jury properly inferred that defendant summarily terminated plaintiff because plaintiff had written an article critical of the emergency employment program in Milwaukee. The verdict should not be disturbed insofar as it found defendant liable to plaintiff.

## II

Just as plaintiff was about to testify to the previously quoted declarations of employment analyst Johnson, defendant sought and obtained a side-bar conference during which, presumably, objections were made to plaintiff's testimony upon the ground that it would be hearsay. The trial court overruled the objection upon the ground that Johnson's declarations were those of an agent or employee of the defendant concerning a matter within the scope of his employment made during the existence of the relationship and therefore admissible under Rule 801(d)(2)(D) of the Federal Rules of Evidence. Defendant urges that the trial court erred in this ruling.

Most of the declarations which plaintiff attributed to Johnson were not hearsay because they were not statements made by Johnson "offered in evidence to prove the truth of the matter asserted." Rule 801(c), Federal Rules of Evidence. Thus, Johnson's instruction to plaintiff to fill out another application in which plaintiff should state that he had quit his landscaping job a week or two earlier were not declarations of fact by Johnson. They were instructions which carried no hearsay implications.

Johnson went on, however, to say, "that the program frequently has people ... that modify their applications so that they'll fit into the guidelines.... It's a frequent occurrence." These were declarations attributed to Johnson which, perhaps, were offered to prove the truth of the matter asserted.

■ It does not appear from the record that such was the purpose of plaintiff's offer of this testimony. Plaintiff did not seek to prove, by way of Johnson's declaration, that people frequently modified their applications so that they would fit within the guidelines. Rather, he sought to establish the circumstances under which he prepared a second—admittedly inaccurate—application for employment. At no time did plaintiff argue the truth of Johnson's declarations. Thus, the testimony was not offered for hearsay purposes and need not have been excluded.

■ In any event, the district court was correct when it ruled that Johnson was

**1324**

defendant's agent, that his declarations concerned a matter within the scope of his employment and were made during the existence of the agency relationship. Defendant acknowledged, when he was examined, that Johnson was his subordinate and responsible for the handling and processing of applications. In those circumstances he was defendant's agent. *Nekolny v. Painter,* 653 F.2d 1164, 1171 (7th Cir.1981); *United States v. Chappell,* 698 F.2d 308, 312 (7th Cir.1983). Accordingly, under Rule 801(d)(2)(D), Johnson's declarations were admissible.

■ Defendant urges that Johnson was not authorized to make the statement he did because, according to defendant, it was contrary to the requirements of the program. Under clause (D) the agent need not be specifically authorized to make the declaration. Cf. Rule 801(d)(2)(C). It suffices if the declaration is made during the existence of the agency and relates to a matter within the scope of the agency.

### III

■ The evidence supports the jury's awards of $17,000 for loss of wages, $800 for loss of fringe benefits, $900 for out-of-pocket costs, $11,000 for injury to reputation, and $5,000 for pain and suffering. Plaintiff's testimony with respect to his period of unemployment, his search for employment and the expenses he incurred in regard thereto was clearly sufficient to support the awards for lost wages, fringe benefits and out of pocket costs. Nor can it be seriously contended that these elements of damage were not the consequence of or caused by defendant's constitutionally impermissible conduct in discharging plaintiff. Similarly, plaintiff's testimony with regard to the injury to his reputation, the remarks made by others regarding his termination, and the effect which the termination as such had on his ability to obtain other employment were all probative of the injury to his reputation which flowed directly from the wrongful discharge and, hence, was compensable. *Busche v. Burkee,* 649 F.2d 509, 518, 520 (7th Cir.1981). Plaintiff also

testified with regard to the personal distress and emotional pain and suffering which he experienced as a result of the unlawful discharge. While this is a very subjective matter, it is compensable. *Busche v. Burkee, supra; White v. Rochford,* 592 F.2d 381, 385 (7th Cir.1979). The jury saw the plaintiff, heard his testimony, and found him to be credible. His testimony in this regard was sufficient proof of his injury. *Cf. Nekolny v. Painter,* 653 F.2d 1164, 1172–1173 (7th Cir.1981).

In *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court held that substantial general damages cannot be awarded for the denial of procedural due process unless based on evidence of actual injury. In *Kincaid v. Rusk,* 670 F.2d 737, 745–746 (7th Cir.1982), this court applied *Carey v. Piphus* to a claim that the defendant had infringed plaintiff's first amendment right to access to certain reading materials. "Because the purpose of § 1983 is to compensate for the injuries resulting from a deprivation of constitutional rights, [plaintiff] must demonstrate that the restrictions found unlawful here caused compensable injury. *Carey v. Piphus,* 435 U.S. 247, 254–255, 98 S.Ct. 1042, 1047–1048, 55 L.Ed.2d 252 (1978); *Wood v. Strickland,* 420 U.S. 308, 319, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975)." *Id.* The court went on to enumerate some of the elements of compensable injury: emotional distress, humiliation, personal indignity and physical injury. *Id.* n. 16. In the absence of such a showing, the *Kincaid* court held that plaintiff was entitled to an award only of nominal damages and awarded a sum of $1.00, while *Lenard v. Argento,* 699 F.2d 874 (7th Cir.1983) and *Owen v. Lash,* 682 F.2d 648 (7th Cir.1982) suggest that certain constitutional violations may support an award of damages in the absence of evidence of consequential injuries, neither of those decisions spoke directly to the issue as did *Kincaid* and neither discussed or cited *Kincaid.*

■ In this case plaintiff adduced evidence showing a variety of injuries which he suffered as a consequence of defendant's constitutionally impermissible conduct.

Lost wages, lost fringe benefits, out-of-pocket costs, injury to reputation, and pain and suffering, all were well compensated. Those are the elements of damages for the wrong plaintiff suffered. In these circumstances, on the basis of *Kincaid* we hold that plaintiff was not entitled to an additional award of $10,000 for "injury to [his] civil rights." That award should be reduced to $1.00.

 We have awaited the Supreme Court's decision in *Smith v. Wade,* —— U.S. ——, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) on the subject of punitive damages under § 1983. The jury was properly instructed with respect to punitive damages and specifically found that the defendant had acted "maliciously, wantonly, or oppressively in terminating the plaintiff's employment." The evidence supports that finding. The defendant acted peremptorily and arbitrarily when he learned of plaintiff's magazine article and the jury reasonably could infer that he acted out of malice toward the plaintiff and with the purpose of oppressing or suppressing plaintiff's exercise of his first amendment rights. The punitive damage award, as modified by the trial court, was proper and should be approved.

 Because plaintiff has substantially prevailed in this court on the appeal, he *is* entitled to an award of attorney's fees in the trial court for the services of his counsel in this court. 42 U.S.C. § 1988.

The judgment is reduced to $47,351 and in all other respects it is affirmed.