**Leone G. RUSSO et al.,
Plaintiffs-Appellants,**

v.

**Emil VACIN, etc., et al.,
Defendants-Appellees.**

No. 75–1075.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1975.

Decided Jan. 22, 1976.

George C. Pontikes, Chicago, Ill., for plaintiffs-appellants.

Thomas A. Hett, Ian H. Levin, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and CHRISTENSEN, Senior District Judge.*

PELL, Circuit Judge.

In issue is whether a claim upon which relief can be granted is stated by plaintiffs' complaint which alleges ward lines were drawn to minimize the strength of political opponents in an aldermanic election but does not allege the wards had disproportionate populations or bore indicia, such as lack of compactness, of some form of invidious discrimination.

The events described in the complaint occurred prior to the April 1, 1975, aldermanic election in Berwyn, Illinois. The plaintiffs are registered voters who prior to the redistricting resided in Berwyn's Fourth Ward. Under the redistricting plan adopted November 11, 1974, by the Berwyn City Council, some fell within the new Fourth Ward, and some fell within the new Fifth Ward. The defendants are the mayor of Berwyn, aldermen who voted for the plan, the Democratic Organization of Berwyn, the election commissioners of Berwyn, and other members of the Berwyn City Council, who were joined only because they were necessary parties so that injunctive relief could be granted against the full city council. The crux of plaintiffs' complaint is that Jerome McDonough, a publicly declared opponent of the incumbent administration and a potential candidate from the Fourth Ward, became by virtue of the redistricting a resident of the Fifth Ward. Since he was no longer a resident of the Fourth Ward, the election commissioners refused to certify him as a candidate in that ward. The incumbent in the Fifth Ward was also an opponent of the administration, and it was known that McDonough would not run against him. The plaintiffs allege that because of the redistricting, they were deprived of their right to vote for McDonough. Leonard Pajak, another opponent of the administration, also found his place of residence changed from the Fourth to the Fifth Ward. The complaint further alleges that the purpose of certain of the defendants' actions was to minimize political opposition in the Fourth Ward. According to the complaint, the objectives of defendants were "accomplished by redistricting the three block area on the east side of Elmwood Street, where McDonough and Pa-

* Senior District Judge A. Sherman Christensen of the District of Utah is sitting by designation.

jak live, which area had previously been in the center of the Fourth Ward, into the Fifth Ward." The complaint alleges that the effect of these actions was to deprive them of their voting rights in violation of the equal protection and due process clauses of the Fourteenth Amendment.

The district court dismissed the plaintiffs' action as presenting a non-justiciable question and this appeal followed. Exhibits presented to the court showed that the wards, as redistricted, varied from the mean population of the ideal ward for the city by less than one percent and that the wards were reasonably compact. Plaintiffs note that prior to the redistricting the wards varied substantially in population. However, since the district court based its dismissal solely on the complaint, our review will be on the same basis.

*Cousins v. City Council of Chicago*, 466 F.2d 830 (7th Cir. 1972), *cert. denied*, 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 151, appear to foreclose plaintiffs' claim unless, as plaintiffs argue, it has been effectively overruled by later cases. In *Cousins*, plaintiffs alleged that ward lines in the city of Chicago were drawn to discriminate against certain racial, ethnic, and political groups. Evidence was presented that an effort was made to keep incumbents within new wards which were approximately the same as the old wards. There was also evidence of an attempt to concentrate independents in two wards so as to minimize their political strength. This court held that disfavoring of certain political groups by those drawing the districts "remains among the non-justiciable political questions." *Id.* at 844.

In *Cousins* this court found it necessary to reconcile its holding with a reference in *Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), to minimizing the voting strength of "racial or political elements of the voting population" in dealing with possible invidious discrimination in creating multimember districts. This court held the quoted language did not indicate that allegations of political gerrymandering presented a justiciable issue. This holding flowed from the Court's summary affirmance of a decision that political gerrymandering does not raise a constitutional question. 466 F.2d at 844. *See WMCA, Inc. v. Lomenzo*, 238 F.Supp. 916, 925 (S.D.N.Y. 1965), *aff'd per curiam*, 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2. Force is added to this holding because it has since become clear that this court is bound by summary actions of the Supreme Court. *Hicks v. Miranda*, 422 U.S. 334, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). The analysis in the dissenting opinion in *Cousins* by then Judge Stevens does not indicate that a different result should be reached in the present case than that reached by the majority in *Cousins* on the political gerrymandering issue.

Plaintiffs argue that *Cousins* is no longer good precedent since the Supreme Court's decision of *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). Plaintiffs characterize *Gaffney* as holding:

> "[P]olitical redistricting designed to preserve and reflect the political balance between elements in the community would be allowed if otherwise proper, but political redistricting designed and imposed by the 'ins' simply to gauge down the political strength of the 'outs' would not be tolerated, even if otherwise proper."

Only the positive portion of this analysis is explicit in *Gaffney*. For the other portion, plaintiffs rely on the language from *Fortson* which this court distinguished in *Cousins* and which the Supreme Court requoted in *Gaffney*. That the Court requoted this language subsequent to our decision in *Cousins* does not cause us to change our interpretation of its meaning in light of *WMCA v. Lomenzo, supra*. The language has been quoted several times but always with reference to multimember districts. *Gaffney, supra* at 751, 754, 93 S.Ct. 2321; *Whitcomb v. Chavis*, 403 U.S. 124, 143, 91 S.Ct. 2220, 29 L.Ed.2d 691 (1971). Multimember districting, though not per se

unlawful, has caused the courts more problems than single member districting such as in the present case. The Court in *Gaffney* recognized that both political and census data would be used in drawing districts "to achieve the political or other ends of the State, its constituents, and its officeholders," and noted that when redistricting is done for political purposes it is not wholly exempt from judicial scrutiny. 412 U.S. at 754, 93 S.Ct. at 2332. We need not delineate in this opinion where the exemption from judicial scrutiny ends. It is sufficient for us to hold that a justiciable issue is not presented by a complaint which pleads that political considerations motivated the drawing of certain district lines but does not plead that the populations of the districts were unequal or that the districting was in any way irrational, *e. g.*, the wards lacked compactness.[1]

Cases such as *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974), and *Weisberg v. Powell*, 417 F.2d 388 (7th Cir. 1969), are inapposite to the present decision. Plaintiffs rely heavily on *Smith*, arguing that it shows that this court has abandoned its position in *Cousins*. In *Smith*, plaintiffs alleged that Cherry ran against Smith for the Democratic nomination for state senate without the intention to run in the general election; rather he intended to withdraw after winning the nomination to allow the Democratic Senatorial Committee to appoint another candidate. This procedure was in effect a fraud on the voters designed to prevent them from selecting the Democratic candidate. Relying on *Weisburg*, this court held where there was purposeful discrimination relating to political rights resulting from the unlawful administration of a state statute by state officers, a violation of the equal protection clause was stated. *Weisburg* involved a scheme by which the Secretary of State in part determined the listing order of candidates on the ballot for the Illinois Constitutional Convention in contravention of an Illinois statute. The statute provided that candidates were to be listed in the order their nominating petitions were filed with the Secretary of State. Petitions were not to be filed prior to July 7, a Monday. The Secretary arranged for a special mail delivery on the preceding Sunday, told favored individuals that his would be done, treated petitions received on Sunday as having been filed at the time the office opened on Monday morning, and decided the order of candidates according to his own preference where more than one petition for a district was received on Sunday. This court held that a cause of action was stated.

Both *Smith and Weisburg* involved violations or misuse of local law with the intention to discriminate. In contrast the present case merely alleges that elected representatives were improperly motivated in drawing new ward lines. The courts have repeatedly recognized that as long as legislative bodies draw electoral district lines, the political impact of their work will not be ignored by such bodies. While the courts should continue to try to protect voters from the misuse of electoral machinery, we do not propose to supplant legislative judgment where the only alleged misconduct is considering political factors in the districting process. This is not to say that circumstances could not be conceived where the actions of an elected body would be so egregious as to constitute a breach of public trust. This is not such a case.

Affirmed.

---

1. We do not mean to indicate that "compactness" alone is a sufficient constitutional standard, but it is useful on an evidentiary basis.