**Stephen G. RUDISILL and Gail P. Rudisill, Plaintiffs-Appellants,**

v.

**Ruth S. FLYNN, Frank Angelotti, Jackqueline Angelotti, and Ralph Huszagh, Defendants-Appellees.**

No. 79–1791.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1980.

Decided April 29, 1980.

Stephen G. Rudisill, Chicago, Ill., for plaintiffs-appellants.

David A. Novoselsky, Chicago, Ill., for defendants-appellees.

Before PELL, Circuit Judge, PECK, Senior Circuit Judge,* and TONE, Circuit Judge.

PELL, Circuit Judge.

This is an action challenging a bond referendum held on May 14, 1977, in the Village of Kildeer in Lake County, Illinois. In that referendum the voters authorized the village to issue bonds to pay for 25% of the cost of designing and constructing a sewer system. The plaintiffs, Stephen and Gail Rudisill, are residents of Kildeer who voted in the election. On May 5, 1978, they commenced this suit against the defendants, various village officials, seeking, *inter alia*, to set aside the results of the referendum. The district court dismissed the action for failure to state a claim and the plaintiffs appealed.

The facts as alleged in the plaintiff's complaint are recounted in the district court's published opinion, 470 F.Supp. 1269, and need not be set forth in great detail here. The gist of the complaint is that the defendants, motivated by the prospect of personal financial gain from the sewer project, persuaded the village Board of Trustees to call for a public referendum on the bond issue. Furthermore, according to the plaintiffs, during the period preceding the referendum the defendants deliberately misrepresented the facts concerning the need for and cost of the sewer system and failed to disclose material facts, including presumably their personal interests therein. The plaintiffs in their brief before this court maintain that "[a]n entire bond referendum election was fraudulently manipulated for the personal financial gain of the public officials holding the election, while they were holding their public offices."

---

* Senior Circuit Judge John W. Peck of the United States Court of Appeals for the Sixth Circuit is sitting by designation.

The plaintiffs rely principally on this court's *per curiam* opinion in *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974). In *Smith* an unsuccessful candidate for the Democratic nomination for the Illinois Senate and a voter in the primary challenged the results of the primary election. The plaintiffs alleged that the winner of the primary election was merely a sham candidate, in that he intended to and did run as a stand-in, later to withdraw so that the Senatorial Committeemen could designate a candidate of their own choosing. This court noted that the "deception on the face of the ballot clearly debased the rights of all voters in the election. Such an abridgement of the right to vote is impermissible and evinces the sufficiency of this complaint." *Id.* at 1102. The court found that the impact of the deception favored "Organization Voters" to the disadvantage of "Swing Voters." Organization Voters, the court surmised, would have voted for whomever the Committeemen selected. Thus, had the deception been exposed their votes would have been the same. Swing Voters who voted for the stand-in, however, might have voted differently had the ruse been revealed. The scheme, the court reasoned, harmed the Swing Voters as well as those who opposed Organization candidates and thus worked " 'in favor of the ins and against the outs.' " (Quoting *Shakman v. Democratic Organization of Cook County*, 435 F.2d 267, 270 (7th Cir. 1970), *cert. denied*, 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971)).

■ Later cases of this court have distinguished *Smith* as a case of a bald and purposeful "fraud on the voters," *Russo v. Vacin*, 528 F.2d 27, 30 (7th Cir. 1976), involving "wilful conduct which undermine[d] the organic processes by which candidates are elected," *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975). We think the

crucial factors in that decision were that (1) the fraud was intimately connected with the ballot, (2) had the purpose and effect of deceiving voters as to the actual effect of their votes, and (3) had the intended result of favoring one relatively distinct group of voters over others. As the court noted, the fraud affected "the face of the ballot" and worked "in favor of the ins and against the outs."

■ The *Smith* decision turned on its own unique facts. Neither it nor any other precedent of this court can be regarded as holding that a federal cause of action arises whenever an incumbent intentionally misrepresents facts relevant to an election issue. In particular, we find the *Smith* decision to be distinguishable from the plaintiffs' claim here in several respects. First, it is doubtful that the fundamental right to vote is even implicated by the conduct about which the plaintiffs complain. In *Smith* a vote for the sham candidate whose name appeared on the ballot was really a vote for another undisclosed person. Here the nexus between the defendants' alleged misrepresentations and the ballot is far more remote. The plaintiffs do not contend that anyone misunderstood the issue placed on the ballot. Presumably all voters understood they were voting for or against village authority to issue bonds to construct a sewer system. In essence the plaintiffs complain that the defendants' "frauds" prevented the voters from making an intelligent choice. We do not regard intentional misstatements of fact made during an election campaign as "election frauds" in the ordinary sense. The merits of a ballot issue are matters reserved for public and private discussion and debate between opponents and proponents.[1] It is for the voters, not this court to decide whom to elect and what ballot issues to approve. *Cf. Socialist Workers Party v. March Fong Eu*, 591 F.2d 1252, 1260 (9th Cir. 1978), *cert. denied*, 441

---

1. The plaintiffs also complain that the defendants refused them access to information relevant to the merits of the sewer project. If this is true, the plaintiffs' remedy would seem to have been to attack the sewer project as unsupported by any studies or concrete data. We recognize the distinct probability that had the circumstances warranted, voters would not have hesitated to draw an adverse inference from the failure of public officials to disclose cost and other information relevant to the project.

U.S. 946, 99 S.Ct. 2167, 60 L.Ed.2d 1049 (1979) ("It is open to argument that . . elimination of such voter misunderstandings as might otherwise occur are the responsibilities of the candidates and voters, and that the failure of the state to assume such responsibilities does not affect 'fundamental rights' "). We conclude that, unlike the conduct in *Smith*, the wrongs allegedly committed by the defendants here are not intimately connected with the ballot itself or the right to vote.

■ Second, even if the actions of the defendants did affect the fundamental right to vote, we cannot say that those actions imposed a substantial burden upon the exercise of that right. *See Storer v. Brown*, 415 U.S. 724, 729, 94 S.Ct. 1274, 1278, 39 L.Ed.2d 714 (1974). The plaintiffs allege that the defendants misrepresented and withheld material facts pertaining to the merits of the sewer project. As we have noted above, the merits of the ballot issue are matters for public debate and discussion. The plaintiffs would have us, under the guise of protecting their rights, judge the form and content of the defendants' speech and expression. Attempts to establish limits on deceptive speech or requirements for disclosure in election campaigns may create their own constitutional difficulties. *See generally Developments in the Law—Elections*, 88 Harv.L.Rev. 1111, 1272–98 (1975). The impact of the defendants' conduct on the exercise of the franchise is too incidental a burden to give rise to a constitutional claim. As the Supreme Court has stated "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. . . . [I]t is essential to examine in a realistic light the extent and nature of [the restrictions'] impact on voters." *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972).

Finally, viewing the complaint in "a realistic light," we concur in the assessment of the district court that the plaintiffs failed to meet their initial burden of showing a discrimination against them of some substance.[2] The plaintiffs have not suggested that any identifiable group of voters profited or was disadvantaged by the defendants' action. Unlike the situation confronting the court in *Smith* where the complaint alleged a manipulation of the election process by the established "Organization," the plaintiffs do not suggest that any particular political or other group was disproportionately affected by the defendants' machinations. Indeed, as the district court noted, if the defendants deceived anybody, it would seem that all voters in the referendum were equally deceived.[3]

For the above reasons, we are satisfied that the plaintiffs failed to present a valid claim under the Constitution. The action of the district court dismissing the action was

---

2. In this regard, although we do not rely on the distinction, we think it appropriate to note that *Smith* involved a primary election to select candidates for representative office while the plaintiffs' challenge is to a single-issue referendum. The Supreme Court has noted in a related context that:

> The equal protection principles applicable in gauging the fairness of an election involving the choice of legislative representatives are of limited relevance . . . in analyzing the propriety of recognizing distinctive voter interests in a "single-shot" referendum. In a referendum, the expression of voter will is direct, and there is no need to assure that the voters' views will be adequately represented through their representatives in the legislature. The policy impact of a referendum is also different in kind from the impact of choosing representatives—instead of sending legislators off to the state capitol to vote on a multitude of issues, the referendum puts one discrete issue to the voters. That issue is capable, at least, of being analyzed to determine whether its adoption or rejection will have a disproportionate impact on an identifiable group of voters.

*Town of Lockport v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259, 266, 97 S.Ct. 1047, 1052, 51 L.Ed.2d 313 (1977).

3. The plaintiffs have suggested that at the very least the alleged election fraud resulted in discrimination between the defendants and "the rest of the voters." This assertion, however, rests on the assumption, not stated in the complaint, that the defendants actually did vote in the referendum. In any event, we are aware of no authority which would prevent a voter from participating in an election or referendum in which he had a personal interest, no matter how corrupt that interest might be.

correct and the judgment is therefore affirmed.