Arthur R. BLOCK, Conant B. Rose, and Judith Jorrisch, Plaintiffs,

v.

John A. MARINO, as Chair of the State Committee of the Democratic Party of the State of New York, Herman D. Farrell, Jr., as County Leader of the County Committee of the Democratic Party of the County of New York, Geraldine Daniels, as Chairperson of the County Committee of the Democratic Party of the County of New York, Clarence Norman, as County Leader of the Kings County Democratic County Committee, Marcey Feigenbaum, as the Chairperson of the Kings County Democratic County Committee, Kathleen Wagner, as President of the Commissioners of the Board of Elections in the City of New York, Daniel Defrancesco, as Executive Director of the Board of Elections in the City of New York, the Board of Elections in the City of New York, and Jerrold Nadler, as putative Democratic Party nominee for election to the office of Member of Congress of the United States from the Eighth Congressional District of New York, Defendants.

No. 92 Civ. 6924 (MBM).

United States District Court, S.D. New York.

April 29, 1993.

Harry Kresky, New York City, for plaintiffs.

Gerard E. Harper, Gregory A. Clarick, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants John A. Mari-no, Marcey Feigenbaum, and Clarence Norman.

Arthur R. Block, New York City, pro se and for co-plaintiffs.

Douglas A. Kellner, Kellner, Chehebar & Deveney, New York City, for defendants Herman D. Farrell, Jr., Geraldine Daniels, and Jerrold Nadler.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Arthur R. Block lost a primary election last September in New York's Eighth Congressional District, by a margin of 88 percent to 12 percent, to a man who, as the electorate well knew, had died before the vote—the late Rep. Ted Weiss. Block and two voters responded six days later with this lawsuit, seeking a judicial reversal of the electorate's resounding verdict. Plaintiffs claim that Weiss's candidacy was a fraudulent and unconstitutional interference with the election, in violation of 42 U.S.C. §§ 1983 and 1985 and the First and Fourteenth Amendments. Defendants are members of the New York Board of Elections; members of the committee that named Weiss's successor, Rep. Jerrold Nadler; and Nadler himself. They move to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, defendants' motion is granted.

### I.

This case arises out of the September 15, 1992 Democratic Party primary election to nominate a candidate for the 1992 general election in New York's Eighth Congressional District. The primary ballot in that election listed two candidates: plaintiff Arthur R. Block (Compl. ¶ 5)[1] and former Rep. Ted Weiss—who had died of heart failure the day before the primary election. (Compl. 21) In death, Weiss received 88 percent of the vote; Block received 12 percent. *See* N.Y. Times, Sept. 17, 1992, at B6.

On September 21, 1992, six days after the primary election, plaintiff Block delivered his

---

1. "Compl." refers to Plaintiffs' First Amended Complaint, dated October 2, 1992.

rather unsportsmanlike [2] riposte to the post-mortem drubbing administered by Weiss: he filed a complaint, seeking among other things a declaration in effect that he had won the primary election. (Compl. at 21(b))

On September 23, 1992, the Democratic Party County Committee of Manhattan met and, after an advisory vote, defendants Geraldine Daniels and Marcey Feigenbaum—chairpersons of the New York and Kings County Democratic Committees, respectively—chose defendant Jerrold Nadler to replace Weiss as nominee.[3] (Compl. ¶ 42) Defendant Nadler won the November 4, 1992 general election with 81 percent of the vote. *See* U.S.A. Today, Nov. 5, 1992, at 12A.

Plaintiffs are Block and two other individuals who claim that defendants infringed their right to vote and Block's right to participate as a candidate in the primary election. (Compl. ¶¶ 5–6, 53) Defendants are five individual New York Democratic Party leaders (the "party defendants"); the New York City Board of Elections and two of its officers; and Jerrold Nadler. (Compl. ¶¶ 7–15)

Plaintiffs claim that defendants violated their First and Fourteenth Amendment rights by (1) perpetrating a "sham candidacy," (Compl. ¶¶ 44–53) and (2) "fraudulently continuing a candidacy." (Compl. ¶¶ 54–68) Plaintiffs assert pendent state law claims for fraud and unjust enrichment. (Compl. ¶¶ 69–76) Plaintiffs seek among other things a declaration that the nomination of defendant Nadler was invalid. (Compl. at 19–22)

Defendants move to dismiss plaintiffs' claims for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Festa v.*

*Local 3 Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir.1990). Thus, a motion to dismiss must be denied "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988).

In deciding a motion to dismiss, the court must accept the plaintiff's allegations of fact as true, together with such reasonable inferences as may be drawn in his favor. *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986). Nevertheless, the complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 836 (S.D.N.Y.1988). "The District Court has no obligation to create, unaided by plaintiff, new legal theories to support a complaint." *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1081–82 (D.C.Cir.1984).

## II.

Plaintiffs' allegations, which this Court must accept as true, are as follows. Ted Weiss was a Democratic Congressman in New York City from 1977 until his death on September 14, 1992. (Compl. ¶ 16) In or about June 1992, the party defendants "were aware ... that Rep. Weiss had potentially fatal health problems and his health was deteriorating." (Compl. 20) Nevertheless, the party defendants

---

**2.** Plaintiffs' complaint calls to mind a protest filed by the management of the 1985 New York Yankees. After the Yankees lost two straight games in May 1985 to the Minnesota Twins, then the top hitting team in the American League, Yankees manager Billy Martin and owner George Steinbrenner filed a protest that the lighting in the Metrodome, an indoor stadium, was too bright. *See Los Angeles Times,* May 11, 1985, Part 3 at 5; United Press International, May 9, 1985, available in LEXIS, SPORTS library, ALLSPO file.

**3.** According to Democratic Party rules, if the nominee withdrew for health reasons or died less than seven days before the primary election, but nevertheless won the primary election, then certain officials of the Democratic Party—here, the party defendants—would select the Democratic Party nominee for the general election. (Compl. ¶ 35)

caused Rep. Weiss to be designated as a candidate for nomination in the primary election with the intention and expectation that Rep. Weiss would not be able to serve another term in office and they would be able to pick his successor.

(Compl. ¶ 21) The party defendants "took no action to inform the Democratic voters of the 8th C.D. of Rep. Weiss's serious health problems," (Compl. ¶ 22) and "intentionally withheld from dissemination to the public information about Rep. Weiss's failing health." (Compl. ¶ 31)

Count One of plaintiffs' complaint is entitled "Sham Candidacy." Plaintiffs allege that defendants "perpetrated a sham candidacy using Rep. Weiss'[s] name" and intentionally deprived voters of information concerning Rep. Weiss's health so that they could name his successor. (Compl. ¶ 48, 50–52) Defendants' alleged scheme was "to cause the name of Rep. Weiss to appear on the primary ballot for the purpose of deceiving the voters to believe that by casting a vote they were voting to have Rep. Weiss represent them in Congress for another term." (Compl. ¶ 47) Through this "scheme" defendants allegedly abridged plaintiffs' right to vote, as well as plaintiff Block's right to participate as a candidate in the primary election. (Compl. ¶ 53)

Count Two is entitled "Fraudulent Continuation of Candidacy." Plaintiffs assert that defendants violated

> their fiduciary obligations as party officials [by keeping] the news of Rep. Weiss'[s] critical illness secret so that the news would not generate a demand from voters and the general public that Rep. Weiss file a declination so that a person able to serve in office would be on the primary ballot in his place.

(Compl. ¶ 64) To support this assertion, plaintiffs cite two sections of New York's Election Law, described below. Essentially, plaintiffs allege that defendants "fraudulently continued" Rep. Weiss's candidacy by concealing their knowledge "that there was virtually no possibility that Rep. Weiss would be able to serve another term in office." (Compl. ¶ 62) Plaintiffs claim that if defendants had disclosed their knowledge of Rep.

Weiss's deteriorating health, then Rep. Weiss would have declined the nomination—either by his own decision or in response to public demand. (Compl. ¶ 64)

Count Three is a state law claim for fraud and unjust enrichment. Plaintiffs allege that defendants defrauded them by failing to disclose their knowledge of Rep. Weiss's health, and that defendants thereby unjustly gained the right to select the nominee. (Compl. ¶¶ 70–76)

### III.

To support all three counts, plaintiffs rely on a handful of cases that have addressed some issues presented by fraudulent candidacies in primary elections. *See, e.g., Smith v. Cherry,* 489 F.2d 1098 (7th Cir.1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974); *Rudisill v. Flynn,* 470 F.Supp. 1269 (N.D.Ill.1979), *aff'd,* 619 F.2d 692 (7th Cir.1980); *Mahoney v. May,* 40 N.Y.2d 906, 389 N.Y.S.2d 355, 357 N.E.2d 1010 (1976); *Farbstein v. Suchman,* 26 N.Y.2d 564, 312 N.Y.S.2d 196, 260 N.E.2d 817 (1970). The central question in those cases was whether defendants had abridged or infringed plaintiffs' right to vote by perpetrating "a sham intended to deceive the voters." *See, e.g., Smith v. Cherry,* 489 F.2d at 1102 (citing cases).

■ Although several courts have found that a candidacy was a sham, these cases do not support plaintiffs' claims because (1) plaintiffs do not allege that Rep. Weiss knew or intended that he would not serve, (2) plaintiffs have not pleaded facts sufficient to attribute to defendants knowledge that Rep. Weiss would not serve, (3) plaintiffs have not pleaded facts from which to infer, and the circumstances do not support the inference of, an agreement between defendants and Rep. Weiss that he would not serve, (4) plaintiffs have not pleaded facts to indicate that defendants' alleged knowledge if disclosed to the public would have changed the election results, (5) plaintiffs' interpretation of the relevant case law offends basic constitutional principles, including the First Amendment.

## A.

First, plaintiffs do not allege that Rep. Weiss knew or intended that he would not serve. Plaintiffs do not allege that Rep. Weiss's candidacy in the 1992 Democratic primary election was, from his perspective, anything other than a legitimate bid for re-election. Plaintiffs do not allege that Rep. Weiss agreed with anyone to withdraw if nominated, or to resign if elected.

Rather, plaintiffs dispute that such knowledge or intent is necessary to prove a "sham candidacy." Plaintiffs argue that a sham candidacy occurs when party officials deliberately conceal their knowledge that a candidate lacks the capacity to serve. (Pl.Mem. at 5) Defendants respond that a sham candidacy occurs when a candidate intends to withdraw upon election, and agrees with party officials that he or she will not serve. (Def.Mem. at 8)

Both parties ground their arguments on *Smith v. Cherry, supra*—apparently the only federal case that deals with sham candidacies in primary elections. In *Smith v. Cherry*, plaintiff Smith lost an Illinois Democratic primary election to defendant Cherry, an incumbent state senator. 489 F.2d at 1100. Defendant Cherry withdrew soon after the primary, and Democratic Party officials selected a replacement nominee, who then won the general election. *Id.* Plaintiff Smith alleged that defendant Cherry never intended to run in the general election, but rather conspired with Democratic Party officials to defeat Smith in the primary election by running as a "sham or stand-in candidate." *Id.* The district court had dismissed these allegations, but the Seventh Circuit reversed *per curiam* and remanded the case to the district court with instructions that

> [i]f the plaintiffs prove an agreement that Cherry would be a stand-in candidate, and show a reasonable possibility that Cherry's sham candidacy affected the outcome of the election, then the district court should order new primary and general elections.

*Id.,* at 1103.

■ Accordingly, the two-part rule of *Smith v. Cherry* is that a sham candidacy occurs when (1) a nominee agrees with party officials that he or she will be a candidate in the primary election, but will withdraw after the primary, and (2) there is a reasonable possibility that the candidacy affected the outcome of the primary. *Smith v. Cherry,* 489 F.2d at 1103. Because plaintiffs do not allege that Rep. Weiss agreed with anyone to withdraw if nominated, or to resign if elected, they do not satisfy this rule.

Moreover, New York law requires that plaintiffs allege that defendants "actually intended" to deceive voters in order to state a claim for election fraud. *See, e.g., Farbstein v. Suchman,* 26 N.Y.2d at 566–67, 312 N.Y.S.2d at 198, 260 N.E.2d at 818; *Ferguson v. New York State Liberal Party State Comm.,* 90 A.D.2d 586, 465 N.Y.S.2d 68 (3d Dep't 1982). "[A]ctual deception of the voters" is necessary to state a claim for election fraud." *Mahoney v. May,* 40 N.Y.2d at 907, 389 N.Y.S.2d at 355, 357 N.E.2d at 1010.

In *Farbstein v. Suchman,* 26 N.Y.2d at 566–67, 312 N.Y.S.2d at 198, 260 N.E.2d at 818, the Court noted that a party committee may not control a nomination by using a stand-in candidate who does not intend to serve. However, the Court held that plaintiffs failed to state a claim for election fraud in that case, because even though the former candidate decided to withdraw after he was designated, there was no "showing of intent by the candidate and [committee] to circumvent the normal nominating process." *Id.*

■ A candidacy does not become a "sham" simply because the candidate may suspect that he or she may not complete the term of office. For example, it is not uncommon for a candidate to run with an expectation of seeking another office before the term of the first expires. Neither is it uncommon for a candidate in poor health to run for office. Rep. Weiss was entitled to run for Congress even if he expected that he would not complete his term, whether by reason of health or other circumstances.

## B.

Second, plaintiffs have not pleaded facts that attribute to defendants knowledge that Rep. Weiss would not serve. Put another way, plaintiffs have not supported with facts

their assertion that defendants knew Rep. Weiss would not serve, if elected. At most, plaintiffs have indicated that defendants thought it was *probable* that Rep. Weiss would lack the capacity to serve through his term, or that he would die before the end of his term.

Although plaintiffs argue in their memorandum that defendants knew that Weiss would die, plaintiffs' complaint shrinks from actually alleging such knowledge, and that is to the credit of plaintiffs and their lawyers. For example, plaintiffs' complaint contains the following allegations as to defendants' knowledge:

> "it was perceived by persons aware of his condition that there was a significant possibility that [Rep. Weiss] would die in the near future" (Compl. ¶ 18)

> "it was unlikely that [Rep. Weiss] would have the physical capacity, in any event, to serve another term in office, or to conduct an active re-election campaign"; (Compl. ¶ 18)

> "the party defendants were aware . . . that Rep. Weiss had potentially fatal health problems and his health was déteriorating" (Compl. ¶ 19)

> "knowledge of Rep. Weiss'[s] critically failing health" (Compl. ¶ 50)

> "the party defendants kept the news of Rep. Weiss'[s] critical illness secret" (Compl. ¶ 64)

Plaintiffs do not plead any more specific facts to support their assertion "that defendants knew that Congressman Ted Weiss was terminally ill and likely to die, or to be permanently incapacitated, before taking office in the new Congress." (Pl.Mem. at 3) Plaintiffs' complaint abounds with indeterminate qualifiers such as "possibility," "unlikely," and "potentially." Consequently, plaintiffs have not alleged that defendants knew or agreed that Rep. Weiss would not serve.

Plaintiffs contend that "[f]ostering the candidacy of a person who is secretly known to be on the verge of death or incapacity is no less deceptive, as a matter of law, than failing to disclose that a candidate is actually deceased." (Pl.Mem. at 8) However, this case is notable for the very opposite scenario: the candidate's death was widely publicized. Moreover, keeping a candidate's dead body hidden while declaring to the public that he or she has a minor ailment is different from failing to disclose that a live candidate has health problems. The former is fraud; the latter may arise from simple decency and respect for privacy. Here, plaintiffs dismiss more lightly than law and logic permit the obvious distinction between even serious illness and death.

Moreover, as a "matter of law" the Seventh Circuit has held that "[n]either [*Smith v. Cherry*] nor any other precedent of this court can be regarded as holding that a federal cause of action arises whenever an incumbent intentionally misrepresents facts relevant to an election issue." *Rudisill v. Flynn*, 619 F.2d at 694. *Rudisill v. Flynn* involved a bond referendum about which defendants allegedly misrepresented material facts. The holding in that case depended in part on the remote nexus between defendants' alleged misrepresentations and the election results.

> The plaintiffs do not contend that anyone misunderstood the issue placed on the ballot. Presumably all voters understood they were voting for or against [the Democratic Party selecting the nominee]. In essence the plaintiffs complain that the defendants' "frauds" prevented the voters from making an intelligent choice. We do not regard intentional misstatements of fact made during an election campaign as "election frauds" in the ordinary sense.

*Rudisill v. Flynn*, 619 F.2d at 694. The Court stressed that (1) the voters were not deceived as to the actual effect of their votes, and (2) the fraud, if any, was not intimately connected with the ballot and did not favor one distinct group of voters over others. *Id.*

Similarly, the voters in this case were not deceived as to the actual effect of their votes—plaintiffs do not dispute that most voters knew Rep. Weiss was dead when they voted for him. Likewise, the alleged fraud occurred more than one day before the election and one distinct group of voters was not favored.

Nevertheless, plaintiffs insist that this Court create a new rule requiring that party

officials disclose material facts in elections. According to plaintiffs' proposed rule, they need not allege or prove that there was an explicit agreement among the defendants to foster the sham candidacy. Rather, whether or not a candidacy is a "sham" depends on "the deliberate nondisclosure of knowledge that the candidate will not serve and a successor must be chosen." (Pl.Mem. at 5) Facts inconsistent with the candidate actually serving might be an intention to withdraw, impending death or physical incapacity, or some other incapacity such as lack of citizenship. (*Id.*) According to plaintiffs, the sham arises from "the concealment of the incapacity to serve *or* of the intention not to serve." (*Id.*) (emphasis in original)

Plaintiffs claim that they satisfy this rule because the party defendants intentionally withheld information to mislead voters and to discourage participation in the primary election. (Compl. 31–33) Plaintiffs allege further that the party defendants intended that Rep. Weiss run for but not serve another term so they could pick his successor. (Compl. ¶ 21, 48)

However, plaintiffs cannot support their assertion that the cases "stand for the principle that the failure to disclose material facts as to viability of a candidacy or the purpose of a petition are actionable [and] clearly establish a duty to disclose." (Pl.Mem. at 12) Plaintiffs merely complain that the above reading of *Smith v. Cherry* is too narrow, and contend that *Smith v. Cherry* also supports the broader proposition that a sham candidacy occurs if party officials foster a candidacy while concealing their knowledge that the candidate lacks the capacity to serve. (Pl.Mem. at 5) But plaintiffs cite no case to support their assertion that "[t]he voters reasonably expect Party leaders to disclose whether or not a candidate their Party puts forward is about to drop dead," (Pl.Mem. at 12 n. 6) and that a court will intervene to protect that expectation.

### C.

Third, plaintiffs have not pleaded facts that imply—and the circumstances do not support—the existence of an agreement between defendants and Rep. Weiss that he would not serve. The best plaintiffs can muster is an argument that "there may well have been an agreement between Weiss and the defendants that he would run, his health notwithstanding, to allow them, rather than the voters, to choose his successor." (Pl.Mem. at 6) Plaintiffs admit that such an agreement would be difficult to prove, but assert that it can be "inferred from the circumstances." (*Id.*)

It is worth quoting at length the factors plaintiffs assert "provide ample basis to infer a conspiracy":

> Weiss ran despite his failing health; no Democratic Party stalwart ran against him in the primary; defendants and other party leaders maintained a wall of secrecy about the state of Weiss'[s] health; when Weiss died the day before the election, the Party apparatus moved with military precision to seize control of the situation and make sure that voters voted for a dead man so that they could determine who the next member of Congress would be.

(Pl.Mem. at 6–7) Plaintiffs' roundhouse assertion is that defendants' actions "are a continuation of a history of manipulation of ballot access by Democratic Party leaders for the purpose of maximizing the control of election contests by party bosses, and minimizing the effective voting power of the electorate." (Compl. ¶ 39)

Despite the broad accusations in plaintiffs' memorandum, facts in the complaint do not support the "inference" of an agreement. A claim for relief "may not be amended by the briefs in opposition to a motion to dismiss." *Telectronics Proprietary v. Medtronic,* 687 F.Supp. at 836 (citing cases). The Court need accept as true only "well-pleaded allegations" of fact. *Miree v. De Kalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). The complaint provides no foundation upon which any reasonable "inference" of an agreement can rest.

### D.

Fourth, plaintiffs have not pleaded facts to indicate that defendants' alleged knowledge, if disclosed to the public, would have changed the election results. In fact, New York's

Election Law *prohibits* the removal of a candidate from the ballot less than seven days prior to a primary election, regardless of facts party officials might disclose. Section 6–152 of the Election Law provides that if a vacancy occurs after the seventh day prior to a primary election, "such vacancy shall not be filled and the votes cast for such deceased or disqualified candidate shall be canvassed and counted." N.Y.Elec.Law § 6–152 (McKinney 1978). If such a candidate nevertheless receives "a plurality of the votes cast, another candidate may thereafter be nominated or the vacancy filled as provided by law or the rules of the party." *Id.*

In other words, after September 8, 1992—seven days before the primary election—it was assured that Rep. Weiss's name would remain on the ballot and voters would be able to vote for him in the primary election. After that date, if Weiss died or was disqualified, but nevertheless won the primary election, the Democratic Party would pick a replacement.

Plaintiffs answer that the Election Law does not bar their claim, because defendants knew *before* September 8, 1992 that "there was no realistic possibility that Rep. Weiss would be able to serve another term in office." (Pl.Mem. at 13) Plaintiffs assert obliquely that Rep. Weiss's death before the election and its publication necessitated "merely a tactical adjustment in a plan that optimally provided for him to live through September 15, 1992." (Pl.Mem. at 8) Plaintiffs argue that the fraud was not the fact of Weiss's death, but rather the failure to disclose the state of his health prior to his death. (Pl.Mem. at 10) "It is not the decision of the voters to vote for a dead man ...; [i]t is that the voters were even put in that situation in the first place." (Pl.Mem. at 10)

However, Rep. Weiss was not even admitted to the hospital until September 10, 1992 (Compl. ¶ 62)—two days after the election law deadline had passed, and plaintiffs do not plead facts to indicate that defendants knew prior to September 8 that Weiss's health was as precarious as it proved later to be. Moreover, this "sham" was disclosed to voters before the primary election. The voters simply decided to vote for Rep. Weiss anyway,

and thereby shift the right to choose Rep. Weiss's successor to the party defendants.

Plaintiffs also cite Section 6–158(3) of the Election Law, but that section provides no more than that party officials must file a certificate to fill a vacancy caused by death or disqualification "ten days after such death or disqualification or four days before the primary election, whichever is earlier." N.Y.Elec.Law § 6–158(3). Because Rep. Weiss did not die until the day before the election, and was not disqualified earlier, that section did not apply.

### E.

■ Finally, plaintiffs' interpretation of the relevant case law offends the First Amendment. It is well settled that voting is a fundamental right, which includes the right to vote in a primary election. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Smith v. Allwright,* 321 U.S. 649, 660–62, 64 S.Ct. 757, 763–64, 88 L.Ed. 987 (1944). However, plaintiffs have not alleged facts to show that voters were deprived of their right to vote. "It is for the voters, not this court to decide whom to elect...." *Rudisill v. Flynn,* 619 F.2d at 694.

■ The First Amendment protects the right of party officials to select the subject matter and content of statements to the public. *See Eu v. San Francisco Democratic Comm.,* 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989); *Geary v. Renne,* 911 F.2d 280, 283 (9th Cir.1990). Political party leaders have no juridically enforceable duty to speak wisely or accurately during campaigns. Our legal and political system leaves shortcomings in that regard to the memory and vengeance of the electorate. Candidates and party officials may not advance a sham candidacy, but, short of fraud, the First Amendment protects their right to decide what message to send to voters. Plaintiffs would have this Court, "under the guise of protecting their rights, judge the form and content of defendants' speech and expression." *Rudisill v. Flynn,* 619 F.2d at 695. Plaintiffs do not plead any facts to support their allegation that it is "standard

practice" for the public to be informed when an elected official has serious health problems or is hospitalized, especially shortly before an election contest. (Compl. ¶ 27) Even if they did, such a practice would raise serious constitutional issues, including concerns about privacy. I will not start down the slippery slope of deciding what party officials must disclose about their candidates.

These concerns were not preeminent in *Smith v. Cherry*, because in that case the fact that a distinct group of voters was denied equal protection outweighed the defendants' first amendment right to advance a fraudulent candidacy. In *Smith v. Cherry*, the Seventh Circuit held that "the impact of th[e] deception fell unequally on the two groups of voters." 489 F.2d at 1102; *see also Rudisill v. Flynn*, 619 F.2d at 695. The Court noted that if the voters who voted for the "sham candidate" had known the truth, one group would have voted for the Democratic Party replacement candidate anyway, but another group would have voted for the other candidate in the primary. *Smith v. Cherry*, 489 F.2d at 1102. Therefore, the effect of defendants' actions was to deceive only the group who would have switched, to the other group's benefit.

There was no such equal protection violation here. To the extent voters in the primary election were uninformed about Rep. Weiss's health, they were equally uninformed. Defendants' actions uniformly affected all voters.

Nonetheless, it appears that voters who voted for Rep. Weiss knew that he was dead. In fact, Rep. Weiss's death was publicized widely. Plaintiffs label the coverage of Weiss's death "an extraordinary 36 hour media blitz, perhaps unparalleled in political broadcasting and news publishing history...." (Pl.Mem. at 15) Plaintiffs do not suggest that any identifiable group of voters did not know that Rep. Weiss had died, or that any identifiable group profited or was disadvantaged by defendants' actions.

In the last few pages of their memoranda, plaintiffs respond to defendants' argument that plaintiffs' interpretation of *Smith v. Cherry*—as requiring disclosure of certain material facts about candidates—would violate the First Amendment. Plaintiffs' response includes a hash of cryptic citations to various first amendment and election process cases. (Pl.Mem. at 16–20) Plaintiffs "briefly review a representative sample of these precedents" and conclude in a paragraph that I find impenetrable:

> Three factors relevant to the instant case may be gleaned from these decisions (and from *Smith v. Cherry*). First, is the *nexus* between party officials and the electoral process. Second, is whether the purpose and effect of an alleged infringement on speech or association is to enliven and better inform public discourse rather than to limit it. Third, is whether the restriction is content neutral. Count II clearly is positive in all three areas.

(Pl.Mem. at 19) (emphasis in original)

If plaintiffs intended that this three-part test would be the *coup de grace* of a confuse-and-conquer strategy, they have failed. The test plaintiffs seem to be talking about appears to be a hybrid first amendment test for the content neutrality of election regulations, except that they apply it to their own complaint—or at least to Count II—instead of to a challenged regulation. For example, plaintiffs argue curiously that "the cause of action asserted by plaintiffs is content neutral." (Pl.Mem. at 19)

Plaintiffs need not fret about the "content neutrality" of their complaint. Defendants charge that plaintiffs' complaint is "frivolous" (Def.Mem. at 2), "preposterous—and offensive" (Def.Mem. at 2), "erroneous" (Def.Mem. at 4), "fanciful" (Def.Mem. at 10), "bizarre" (Def.Mem. at 18), a "publicity-stunt" (Def. Reply at 1), "patently absurd" (Def. Reply at 9), and "a waste of time and resources of this Court" (Def. Reply at 10); the one charge defendants do not level is that the complaint is not "content neutral."

\*    \*    \*

Plaintiffs' complaint is content neutral, but it is also content negligible. Accordingly, and for the reasons stated above, defendants' motion to dismiss is granted.

SO ORDERED.